AEROTEL LTD v. TMOBILE USA May it please the Court, I am Dennis Flaherty from the law firm Australia Chalk Flaherty & Breitman, PC, representing the plaintiffs' appellants, AEROTEL Ltd. and others. AEROTEL is requesting de novo review of the claim construction by Judge Robart of Claim 23 of the 275 patent. I should note that the same claim was construed in another litigation where the same patent was being asserted by Judge Hallwell in the Southern District of New York. Judge Hallwell's claim construction differs on several issues from Judge Robart's claim construction, on at least three issues. I should note that we have filed a Notice of Appeal in that case, but it only relates to Claim 9, not to Claim 23. Claim 23 was dismissed by order granting summary judgment by non-infringement of Claim 23 by Judge Hallwell, but Judge Hallwell's order provides that it should have no preclusive effect. And also there's nothing in the order to indicate that the claim construction of Claim 23 was critical and necessary to the finding of non-infringement. Let me ask you, just so I'll understand the logistics here, I mean there's so many, there are quite a number of claims of terms that we're construing here and they're challenging. Am I correct that if we were to affirm a district court judge on any one of the independent constructions, on the separate constructions, that would dispose of the case? Or are there pieces that need to be put together? Yes, if we have to win, Airtel has to win on all of the issues. All of the ones listed in the stipulation, right? Yes. Right, okay. Now the 275 patent discloses systems and methods for enabling authorized users to make prepaid telephone calls. And to enable that, the inventors of eCamille invented prepaid call processing equipment called the Special Exchange. Now the Special Exchange performs the functions of user verification and call monitoring and the accounting function. The patent discloses exemplary embodiments for different uses of the Special Exchange, including what we call the Any Available Telephone embodiment, which is disclosed in Figures 1 and 3. But there's nothing in the patent to disclaim other uses of the Special Exchange. Let me ask you, what's the heart of, I guess, is there some heart to this so we can understand? I mean, is your main dispute with respect to the redialing, is your main argument here that the special code doesn't have to be inputted by the calling party, that it can be done some other way? Is that one of the… Well, the inputting of the special code has to be done in two respects. It's the Special Exchange that has to receive the special code in order to verify it. And the calling party cannot input the special code to the Special Exchange because it is separated by the regular telephone system. So the calling party has to input the code into his telephone, and then the regular telephone system has to input the special code into the Special Exchange. So where it says in Claim 23, inputting a special code, and then later… Wait, where are you talking about, D? 23D, yes. Inputting a special code, that does not say who does the step. Well, it says inputting a special code and the number of the called party. Isn't it the person placing the telephone call that does both of those? Again, the user does both of those, inputting those into his phone, but ultimately they also have to be done by a machine at the regular telephone system in order to input those same numbers into the Special Exchange. Because the user… The telephone company functions merely as a conduit to the Special Exchange. With respect to any available telephone environment, yes. Well, but why not? In other words, Judge Prost is asking, and I have the same question, that the 23D limitation, inputting a special code, does appear to be something that is done by the user, by the calling party, right? And is required to be done by the calling party. That's correct. And that's confirmed, seemingly, by the language inputted by the calling party in E, right? That's right. Now, the question is, why doesn't that… Why isn't that exactly what the District Court is saying when the District Court says that you enter the special code as the calling party each time you contact the Special Exchange in order to make a telephone call or a series of telephone calls? Well, that's just how it's done in the Any Available Telephone Embodiment, which is the exemplary embodiment disclosed in the patent. Well, why doesn't this… Why doesn't the requirement that the user enter the special code and the number apply to all embodiments, necessarily, because that language is mandatory language in 23A? In other words, put it another way, describe for me your concept of how the special code is entered by the calling party in a way that makes the District Court's construction unduly narrow. The calling party could input his code as part of a replenishment process, and then the value of the card would be stored in memory, and then later the user would call the Special Exchange when he wanted to make a phone call, and he would no longer need to input his special code if, when he replenished the special code and the prepaid amount with it, were registered or associated with some other number, such as his telephone number. A person who has a home telephone, there's a prepaid calling service where you buy a prepaid calling card, and you have the option of calling up the Exchange and getting the card registered to your home phone number. So, thereafter, it's not necessary to enter the special code when you want to make a call. You dial the Special Exchange, you need not enter the special code, because the system recognizes your home phone number as registered. So, in that embodiment, you would not be constrained that the inputting step would have to be performed every time you connect to the Special Exchange, and you would not be constrained that... Well, how do we, I mean, I guess I understand what you're saying, I think, but when you look at the language in E, I mean, I know there are 23, obviously there are 23 claims here, and this is the one, the only one at issue. How are you getting that from E? I mean, E seems to be quite narrow and quite specific, only if the special code, I mean, seems to absolutely require that the special code be inputted by the calling party. Otherwise, you don't get connected to the called party. Am I misconstruing what E says here? No, but again, going back to D, D is not so limited. It doesn't say the calling party inputting a special code, so inputting a special code should be construed broadly enough to cover both the user inputting a special code, as stated in E, and also... Right? So, I mean, even if D weren't there, you need E to complete the call, right? The claim should be construed to that both the user inputs a special code, and then the regular telephone system inputs a special code to the Special Exchange, and then, yes, indeed, one of the preconditions... And what about the other part, though? It says inputting a special code and the number. Are you saying that the caller doesn't have to input the number? No, the caller, same argument, the caller also has to input the destination telephone number into his telephone, and the regular telephone system also has to send that destination telephone number to the Special Exchange, if the Special Exchange is going to route it further. So both man and machine have to do it at different stages in the process, and Step D just doesn't say who does it, doesn't say what that is covering, whether it's the person or the system. So your concept, I take it, of Claim 23 is that it would reach a system in which, in January, I sign up for this service and I put $1,000 of credit for my calls, and then, at that point, I would have to enter a special code, but I only have to do it once. And once I've done it, I hang up, I go away, I come back in March, June, September, and October, and each time I dial a number, I first dial in to the Special Exchange, but I don't have to dial my code because the Special Exchange recognizes my phone, and then I just dial the number of the party that I'm trying to reach. And that constitutes, inputting the special code was done back in January, right? And the number of the called party is done in October or June or March, right? That is conceivable. Well, but that would have to be your view as to how this Claim 23 would read on a system in which you don't enter the special code every time. Yes, once you registered your phone number with the company, well, every time you bought a card, you would have to register your phone number. But it's not just registering your phone number. You have to actually enter the code. Right, you have to enter the code. So if I went to T-Mobile's office and they asked me, would you like to sign up, and they enter my phone number, then they wouldn't infringe, right? Because I haven't entered the special code. No, T-Mobile... Right, but it has to be entered by the user, by the calling party. Well, it also has to be entered by... If the sales representative, well, there's the option where the calling party does it, and T-Mobile doesn't do it, but if you are in a T-Mobile store and the sales representative does it for you, I don't understand why that's not infringing. T-Mobile is performing the step. And it's a muni-option issue. T-Mobile has to perform all the steps of Claim 23. So you say that if I give my telephone number to the T-Mobile salesman in signing up, and the T-Mobile salesman inputs my telephone number into the system, then that constitutes a special code that is inputted by the calling party, me, right? Even if some other party other than me is going to use the system, like my wife, she wouldn't be the calling party. I mean, she'd be the calling party, but she wouldn't be the person that inputted the code, right? Well, the problem that I have, principal problem that I have is E, which says the special code inputted by the calling party. And the problem, if I go into T-Mobile and I say I want to sign up for a phone that's going to be used by my wife, then I'm not the calling party, even though I may have inputted the special code, right? You would agree that that wouldn't read on, that wouldn't infringe 23 as I understand your construction. If the user doesn't input the special code, yes, but in other embodiments for T-Mobile, the user does input the special code, especially if you bought on the internet, and he has to call up and input the card number, and it gets applied on his phone. I see I'm at rebuttal time. I'd like to save the rest of my time. Thank you. Oh, we'll save all of your rebuttal time because we've asked so many questions. Very well. Thank you. Ms. Joseph. May it please the Court. I am Shannon Jost, representing T-Mobile. Unless this Court reverses all five of the claim constructions upon which Aretel based the stipulation of non-infringement, the summary judgment of non-infringement must be upheld. Therefore, as the Court noted at the outset, if the Court finds that even one of the district court's constructions of those five terms is correct, we're done. So what's your best one? Well, I think we've got strong arguments on all. I'd like to focus on two in particular, dialing said special exchange and inputting the number of the called party. But before we get there, I did want to respond to one point that Aretel, I believe, was making in their argument, essentially proposing that the telephone number of a subscriber could be substituted for a special code, and we disagree with that. We believe that Aretel disclaimed in prosecution at A-273, which is the original amendment in response to office action, that the special code could be a subscriber telephone number. That simply is not possible, and the reference again is A-273. Turning to the dialing step. Can I ask a few questions? Which you're going to cover, just as a logistical matter. Sure. You talked a little about the New York, the pending PO. Yes. And that there's some discrepancy between, have the two you picked out, are those something that is the same with respect to the New York case as here, or is that where the district court's claim construction diverged? There is some divergence in the construction of dialing said special exchange. The Washington court, Judge Robart construed that term to mean that the calling party enters the telephone number of the special exchange by dialing the number on a telephone. The construction by the New York court was that the party makes a connection or a telephone call to the special exchange. Certainly we believe, and I will add, though, that the Southern District of New York's construction of special exchange, which is not appealed by Aretel in either this case or in the Southern District of New York's case, required that the special exchange have a regular telephone number. So there is a commonality between the two. Certainly the requirement that there be a telephone number that can be accessed from any available telephone is consistent with the district court in Washington's construction. And Aretel has not appealed for the construction of special exchange in the Washington court, and thus is bound by it. The district court construed special exchange as consisting of a telephone router, computer, and memory that is behind the local exchange and can be reached from any available telephone. The construction that Aretel proposes ignores the plain meaning of dialing, and it ignores the fact that every single reference in the specification to dialing said special exchange referred to the calling party picking up the receiver of the telephone, going off hook, and dialing the telephone number of the special exchange. In the specification in A96, the general description of the invention teaches, not in reference to any particular embodiment, that the customer acquires a special code, a credit amount, and the telephone number of the special central offices. This is at A96, column 3, lines 3 through 6, and there are additional references in that same paragraph to the customer receiving the telephone number of the special exchange. Continuing in that paragraph at A986, column 3, lines 18 to 22, subsequently thereto, the acquiring party wishes to make a telephone call. He, the acquiring party, uses the nearest available telephone, removes the handset, picks it up, again, this was back in 1985, which was long before wireless telephones were ubiquitous, and dials a special central office. Well, yes, but Mr. Flaherty deals with, I think, well, I won't put words in his mouth, but I would anticipate Mr. Flaherty would say, that's just embodiments. I mean, these are illustrative embodiments of the way the system does and can work, but that doesn't exclude an embodiment of the sort that he and I were discussing with respect to my purchasing a service, in which the inputting of the special code was done at the outset. Why is it that that kind of special service in which the inputting of the special code is done at the outset is outside the scope of Claim 23? Maybe you were getting there, so I don't want to cut you off. I have more to say on the score. I understand the commonality between the dialing step and the inputting step, because both require action by the user as opposed to some other party. And there's a sequence issue, which I understand that you argue. Correct. I didn't want to push you off if you had more to say on the dialing issue, but if you didn't, if you were done with that, I wanted you to address that. I did want to point out one point in connection with the dialing issue, and I believe that the statements that Arotel made to distinguish the SAFA reference during the re-exam preclude Arotel's argument, specifically at A1047, which is the March 2002 response to office action. I believe it's in the middle of the page there, again, A1047. Arotel was distinguishing the SAFA reference as it had been applied to reject Claims 1 and 23. And Arotel stated that SAFA does not use the regular telephone system to access the device. Instead, when the user picks up the handset, the SAFA device returns a dial tone to the user without the user having to dial the device. And Arotel underlined that portion of the specification. That's not with respect to a particular embodiment covered by Claim 23. That's distinguishing Claim 23 over the prior art. And I think that's the end of Arotel's argument in that respect. Turning to the inputting step, the district court held that Step 23D, which is inputting the special code and the number of the called party, both must be performed by the calling party and must occur after Steps 23A through 23C. Looking first to the claim itself, as Your Honor did, Step 23D requires inputting a special code and the number of the called party, and there certainly can be no argument but that the calling party must input the telephone number of the called party. And then Step 23E explicitly refers back to the special code inputted by the calling party. The specification is entirely consistent with the district court's construction. For example, at A986, column 3, line 17 to 31, the general description of the invention, no reference to any particular embodiment, describes a sequence where the calling party wishes to make a telephone call. He uses the nearest available telephone, removes the handset and dials the special central office, and when he is connected to the special central office, he dials the identifying code and the called number he wants. There is no mention of any temporal gap between those steps, and there's certainly no mention of being able to input the special code in May and make a later telephone call in June. Well, there isn't any express reference. Of course, we wouldn't be here if there had been. But why is it that the language of 23A is not at least amenable to a construction? And now I'm focusing again on the inputting a special code limitation. Why isn't it amenable, setting aside the specification and treating the specification for present purposes as illustrative and embodiment-type language? What is it about the structure of 23 and the language of 23 itself that forecloses an argument such as the one made by Mr. Flaherty with respect to the timing issue? That is, timing as in my example, in January you enter that special code, and once you've done, you're triggered for all the calls that you later make during the year, as long as your money hasn't run out. For starters, 23D is drafted as one step. Combined in the same step is both inputting the special code and the number of the call party, and there's no precedent for temporarily splitting that step. And in contrast, in Claim 1, steps, this is on page A987, steps D and E of Claim 1 split that into two steps. So clearly if the patentee wanted to split that into two steps, he knew how to do it. He didn't do that in Claim 23. Further, when you look at the intrinsic record, both the prosecution history and the reexamination, the patentee repeatedly referenced that same exact sequence of steps. There was no temporal break between dialing the special code and then, in short sequence, inputting the special code, excuse me, dialing the special exchange, and then in short sequence inputting the special code and the number of the called party. And respectfully, even if the specification were broad enough to encompass the construction that's proposed by Arotel, and I believe for the many reasons we've stated in our briefing that it's not, the intrinsic record forecloses that, because we have to look at the claim as it would have been interpreted by the inventor, not looking just at the claim and the specification, but viewing those in the context of the intrinsic record. One example would be in the slide presentations that Arotel submitted to the PTO, where Arotel shows in graphic form and in a very specific sequence of steps 1, 2, and 3, dialing the special exchange using a telephone number from any phone, inputting the special code, and inputting the number of the called party. That's the same sequence that is depicted in figure A, excuse me, figure 1 of the patent at A91. It's the same sequence that is described in the specification, in particular in column 3, and it's the same sequence that was referenced in the patentee's written submissions to the PTO. Now, you agree, I infer from your brief, but correct me if I've inferred incorrectly, that the Claim 23 would read on a system in which you input the special code and then make a sequence of calls, and you don't re-input the special code before each call, as long as that sequence of calls all occurs before you disconnect with the special exchange, correct? Correct. And the key is that you must remain connected to the special exchange. Right.  It was drafted in terms of connected to the special exchange, not in terms of connected to the called party. Correct. And, in fact, if you look at figure 1 of the patent at A91, the patentee did illustrate the flow. And there's something in the specification, I guess, in column 6 that talks about the multiple calls. Yes, Your Honor. Right, okay. Now, why does that not stand as a counterexample to the proposition that D is necessarily, the two parts of 23D necessarily go together in all cases? Because that would be, in the third or fourth call, that would be an instance in which you would not be both inputting the special code and inputting the number of the dialed, the called party, right? In that instance, step 23D, both parts of step 23D would still be occurring after steps A, B, and C. Well, that's right. There would be no disconnection. But they wouldn't be occurring together. In other words, what I understood you to be arguing earlier was you can't split up 23D. You have to say both of these things have to happen in sequence after B and before D. I'm sorry, after C and before E. But that wouldn't be true in calls 2 through N of the sequence of calls, right? That's correct. And, in fact, both we and, in the Southern District of New York case, the telco defendants have taken the position that, at best, Claims 1 and Claim 23 would only cover the first call that's made. And there are other reasons that that's the case. But I think even— Oh, I'm sorry. So your position would be that a system that makes multiple calls would simply not be covered by Claim 23, except for the first call? Not based on a narrow reading of the claim. I think the broadest reading of the claim that would be permitted would still require that Steps A, B, and C still be accomplished before Step D takes place. The patent simply does not contemplate a temporal disconnect, a hanging up from the special exchange and then being able to somehow make a call again without repeating Steps A through C. Okay. And certainly that's not depicted in Figure 1. And even in the replenishment example, which is not covered in Claim 23, that's claimed at best by Claims 7 and 21, which depend from Claims 1 and 9, you're still remaining connected to the special exchange. There's still no disconnect. And I did want to talk briefly about the connecting step as well, unless you had other questions. This ties very closely into the inputting step. And again, the district court held that a call would be connected only if the calling party first enters a valid special code. The specification is clear that the special code must be inputted and validated each time the party makes a call. And this may respond to your... Each time the party makes a call or each time the party is connected to the exchange? Each time he connects to the special exchange to make a call or a series of calls. Because one cannot make a prepaid call without first connecting to the special exchange. And this introduces a defect in Arendtel's argument, because if a party had once entered a valid code and then was never required to enter it to the special exchange again for validation, there would be no way of knowing whether that code was in fact still valid. And that would defeat the purpose of the invention. It looks as though I'm out of time, unless you have further questions. Thank you. Thank you, Ms. Jost. Mr. Flaherty, we'll give you your full... Did you reserve three minutes? We'll give you your full three minutes. Thank you, Your Honor. Okay, the argument about that inputting special code at the number of the call party is one step, but it doesn't make any sense because it's impossible to do it all in one step. You have to enter the special code, then you have to enter the destination telephone number. So it is two steps, and it has to be done at two different times. It's impossible to do it at the same time. Now, Judge Hallwell, in construing... Well, but that's... You could have process for changing the tire, and one of the steps could be take off the lug nuts and take off the tire, and that would be perfectly sensible to have as a single limitation, but it would jolly well have to be done after you jack the car up, right, and before you drive off, if those are steps A and C. I mean, I don't understand... Well, it's just two separate steps. The argument you're making, it's two separate maneuvers, but it's perfectly legitimate to say that they have to be done together and after everything that came before and before everything that comes after, right? Okay, but the clear language of the claim doesn't require it. It's just the placement... Well, that goes back to your argument. That doesn't depend on the fact that there were two elements to that step, it seems to me. Well, Ms. Joseph thought it was significant that in Claim 1 it said D and E, and in Step 23 it says just D, and I don't think that's significant. But let me move on. I think Judge Robart's construction of Claim 23 is based entirely on limiting it to the disclosed embodiment of any available telephone, and, in fact, the preamble, Airtel was very careful. During prosecution, Airtel argued that any available telephone was a limitation of Claim 1 and 9 that distinguished over the prior art. That's in the appendix at A1136. And then also it was very careful to state to the examiner during the reexamination that Claim 23 was not so limited. The preamble does not mention any available telephone, and that's at A1220 in the appendix. And then the Patent Office, in an action in the second reexamination, acknowledged that Claim 3, the preamble, it was not limited to any available telephone, making calls from any available telephone, and that's at A1256. And Judge Robart, in his opinion, was very careful to say that he said that when he construed Special Exchange, that the Special Exchange had the limitation any available telephone wherever it appears, and when he went on to construe the claim, he, I presume, understood that that also applied to making a method for making telephone calls, although he did not explicitly state that. Finally, I would like to mention in the monitoring, Judge Robart's construction of the monitoring is wrong for multiple reasons. First of all, he said the cost of the call is continuously calculated. Step F of Claim 23 does not contain the word continuously. In fact, his statement that it has to be calculating cost, that really isn't monitoring, because as Judge Hall will say in New York, monitoring implies a comparison, and just calculating the cost is not monitoring. And also, if you look at Figure 1 of the patent — and I won't charge you for this time, but technically in reply, you're supposed to be replying only to arguments made by the other side, and the monitoring seems to me, if I recall correctly, I may be wrong, but I don't believe that was mentioned in that. Okay, Your Honor. Go ahead. I will give you a little extra time if you have anything further to say. Well, the last thing I would say is that Judge Hall will also construe the dialing step as being just making a call to or a connection to the special exchange, so properly construed dialing would not require a telephone number to input a telephone number of a special exchange. And it doesn't have to be a conventional telephone number anyway. It could be an unconventional telephone number like 888 to reach a special exchange. Thank you, Your Honor. Thank you. The case is submitted. We thank both counsel. We will hear argument next in No. 2010-5077, Macias against Department of Health and Human Services. Mr. Moxley, when you're ready. Thank you. Please record, counsel. I'm Robert Moxley from Cheyenne, Wyoming. I come here on behalf of the entire petitioner's bar of the Vaccine Injury Compensation Program to ask this court to finish what the Avera case started. Don't you really ask us to undo part of what Avera did? As I understand your brief, Mr. Moxley, you say Avera was correct to the extent it adopted the forum rule but was incorrect to the extent it adopted the law of the Davis County exception. That's absolutely my position. It is also my position, however, that the record in this case overwhelmingly shows that factually the Davis exception does not apply in this case. Let's assume that we are in the regime where the Davis County exception applies. We have to follow the law of Avera. It seems to me that what you complain about is the way the special master arrived at the $220 rate. Is that correct? Well, very much. It's not the way he arrived at it. The situation is that there has never been a proper determination of the relevant market. Even if Davis County applies, there was never a determination in the Avera case of what is the relevant market. Under Avera slash Davis County, we make two determinations. One, where was most of the work done? Where was the overwhelming majority of the work done? Two, what is the discrepancy, if any, between the forum rate, in this case District of Columbia, and what we'll call the hometown rate, Cheyenne, Wyoming? As I understand it, in that context, what are you complaining about? I am complaining that the basic law set down by the Supreme Court has not been imported into the vaccine program, and that there has not been a proper market determination or relevant community determination. Even if Davis County was to apply, the relevant market in Cheyenne, Wyoming, is the federal practice market. There has never been one word in a vaccine case. So you're saying that in this case, the error on the part of the special master was in determining, again, doesn't it come down to, in his determination of the $220 rate, because you're saying the special master went about it the wrong way. Well, no tribunal anywhere that I know of is allowed to draw irrational inferences from the evidence, much less make up the evidence. This special master had no evidence before him whatsoever with regard to what the market rate is in Cheyenne, except for the evidence that I, I'm sorry. Yeah, I thought you started by telling us the evidence was overwhelming. The evidence was overwhelming, but it was my evidence. And your evidence was, as far as I could tell, so where am I wrong, one affidavit, I guess, by a practitioner in Cheyenne, Wyoming, who didn't do vaccine cases? Well, that and the evidence compiled by the United States government in defining the federal practice market between Wyoming and Washington, D.C., and indeed every place else. I don't understand that. The best evidence of the federal practice market everywhere in the United States is the locality rates that are paid to Department of Justice attorneys, among other people. Are you saying that, let me make sure I understand, you're saying that the federal practice rates for private practitioners ought to be parallel to the amount paid to AUSAs? In fact, it just is. My evidence, the witnesses I presume... Are you sure you want to be compensated at the same rate as an AUSA? Sure. What's that hourly rate? What's that? What's that hourly rate in Cheyenne, Wyoming? The hourly rate in Cheyenne, Wyoming that would allow me to pursue a dedicated vaccine practice... No, I'm asking what the hourly rate is for U.S. attorneys in Cheyenne, Wyoming. They don't have an hourly rate. No, they don't, but if they work, let's say they work 2,000 hours a year and they make $100,000 a year, they're making, what, $50 an hour. They make 87% of what Washington, D.C. attorneys make. I would therefore be willing to take 87% of Laffey Matrix rates because the people who do federal practice in Washington, D.C. under every statute that uses the term reasonable attorney's fees receives the Laffey Matrix as the floor of their compensation. All you're saying with that is that the AUSAs in Cheyenne are underpaid and the AUSAs in Washington are grossly underpaid. That doesn't seem to me it gets you very far. Congress sets rates for pay of federal employees, including, I might add, judges, at pretty low numbers. That is not something that I think... Let me put it this way in the argo of the age. I don't think you want to go there. Well, imagine a situation where, using the logic of this case, an advertisement for vaccine attorneys in the Department of Justice was put out saying vaccine attorneys wanted limited skill set needed and those attorneys were paid less than other federal attorneys. That is what this situation is. This situation is that, well, what this situation has created is a situation where counsel are not available to vaccine-injured petitioners. Judge Shaw wrote in the Sondra... Well, Congress was charged with creating this regime and, in fact, maybe you know better than I, but I don't recall seeing any other statutory scheme where attorneys get reasonable attorney's fees even if they don't prevail in a case. There are several. There are several. There are numerous. But, so take it... I mean, why isn't that an argument to be taken to Congress? I mean, your arguments about the needs of attorneys and the unavailability of attorneys, that's not something... I have a hard time evaluating that from the bench, deciding those kinds of issues. That sounds more like a congressional hearing to me. There's a very simple answer to that and it is in the new Purdue case from the United States Supreme Court. Justice Alito, in the new Purdue case from the United States Supreme Court, said that my burden in order to get an adjustment, as it were... Actually, I'm earlier in the process because I just want the rate set properly to begin with, but it should be a distinction without a difference between setting the rate or adjusting the rate, and Justice Alito wrote in the Purdue case that my burden is to identify a factor not taken into account by the Lodestar, and in this case, the factors that have never been taken into account in the so-called Lodestar, which is simply hours times a rate. Lodestar is not a very helpful term, but the thing that has never been taken into account in vaccine practice is that this is a very expensive specialty practice. Are you saying, Mr. Monson, there should be some kind of... Leaving aside whatever Davis County, Guam, any of these cases, there should be some kind of a special rule that applies for the vaccine bar because of the complexity or uniqueness of vaccine program practice? Well, there's a case... This Purdue case is the culmination of a long line of cases that talks about the question of whether or not adjustments are available, and if you go back through the Supreme Court's jurisprudence, you find a very influential case, Delaware Valley 2. There are actually two cases in Delaware Valley, and the second one talked about whether or not contingencies in cases should be compensated with an enhancement for risk. I may have missed it, but are you saying that there should be some kind of a special approach in Vaccine Act cases? No. I think we should be entitled to get what people get in Washington, D.C., for doing FOIA cases. I believe that we should get what people get in Washington, D.C., for doing civil rights cases. Now, when you say we, you're talking about lawyers like yourself in Cheyenne? Everywhere, because this is a national market. But then you're saying, though, aren't you saying that we should... to the rule, if you will, that Avera lays out? Well, yes, but I must insist that Avera was wrongly decided. But that isn't something that we can really address as a panel. That is an argument that really can only be addressed, I think you'll agree, to the in-bank court. We can't say, well, you know, we've looked at Avera, and we just think that panel got it wrong. Therefore, we're going to decide this case differently. I respectfully disagree. You disagree with that proposition or you disagree with Avera? I know the latter. I respectfully disagree with the assertion that this panel can't do anything about Avera or depart from the application of Davis County that was essentially crammed down my throat. The difference is that... Let me put it this way. How would you craft the paragraph of our opinion, if we agreed with you, that we ought to try to disavow Davis County? What would we say? You would say that there was never an opportunity for the petitioner in Avera to demonstrate with evidence that the relevant market in Cheyenne, Wyoming is a federal practice market, a complex federal litigation market, which was not reflected in the generic local rate that was awarded in Avera. Okay. I think the statement comes from the Avera opinion, I think, quoting you, which says since 2004 I've charged my clients $200 per hour and the increase is going to go increase to $250. That is very high for the Cheyenne market. That's the Cheyenne market, but that's not the Cheyenne federal market. Were you doing federal cases in your experience? You mean up until 2004 you were doing non-federal cases? That was office practice. That was criminal defense. That was state court practice. And that was practice on retainer. That was practice where I got paid. That was practice where I didn't have to wait 6 or 7 or 9 or 15 years to get paid for my efforts. Federal law does not countenance a hardship on counsel. Federal law calls for rates that allow counsel to be effective. So what you're saying in terms of the rule of law, so we can just go back to Judge Bryson and Judge Shaw's point about how we deal with the barrier, but you want and need a rule that says the Laffey Matrix applies and there's no distinction to be drawn in federal cases.